**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **SHERYL LAMBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:24-CV-180 (MTT)** |
| | ) | |
| **COLISEUM MEDICAL CENTER, INC.,** | ) | |
| ***et al.,*** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

Sheryl Lambert filed this action against her former employer, Coliseum Medical Center, Inc. ("CMC").[1] ECF 11. Lambert asserts claims for discrimination and retaliation under the Americans with Disabilities Act ("ADA"). ECF 11 ¶¶ 12-62. CMC has moved for summary judgment on all of Lambert's claims. ECF 21. For the following reasons, CMC's motion for summary judgment (ECF 21) is **GRANTED**.

---

[1] Initially, Lambert named only Piedmont Macon Hospital, Inc. as a defendant. ECF 1. In its corporate disclosures, Piedmont stated that Coliseum Medical Center, Inc., should be substituted as the sole defendant in this action because Piedmont was never Lambert's employer. ECF 8 at 1 n.1. Piedmont also explained that Coliseum Medical Center, LLC has been converted into a corporation, and now operates as Coliseum Medical Center, Inc. ECF 8 at 1 n.1. Lambert subsequently amended her complaint to name only Coliseum Medical Center, Inc as a defendant. ECF 11. Thus, Piedmont Macon Hospital, Inc. and Coliseum Medical Center, LLC are **DISMISSED** from this action.

# I. BACKGROUND[2]

## A. Factual Background[3]

Lambert was hired by CMC on September 5, 2023, as an "RN Care Manager." ECF 21-1 ¶ 3; 26 at 14:21; 31-3 ¶ 3. In early 2024, Lambert requested an accommodation to move offices because she had Attention Deficit Hyperactivity Disorder ("ADHD") and Post Traumatic Stress Disorder ("PTSD") and needed a work environment with fewer distractions. ECF 21-1 ¶ 50; 31-3 ¶ 50. Lambert ultimately rejected the accommodation offered to her by CMC because, according to Lambert, it did not meet her accommodation requirements. ECF 21-1 ¶¶ 118-119; 26-46; 31-3 ¶¶ 118-119. CMC later terminated Lambert's employment. ECF 21-1 ¶ 169; 21-4 ¶ 18; 25-3; 31-3 ¶ 169. Lambert alleges that CMC discriminated against her because of her disability and that CMC retaliated against her by terminating her employment after she requested an accommodation. ECF 11 ¶¶ 50-62.

---

[2] While Lambert disputes many of the facts asserted in CMC's statement of material facts, Lambert failed to include specific citations to the record as required to properly dispute facts under Rule 56(c)(1) of the Federal Rules of Civil Procedure and under Local Rule 56. *See* Fed. R. Civ. P. 56(e)(2) and (3); M.D. Ga. Local Rule 56. Nonetheless, the Court has conducted a review of the record, and the facts below are undisputed unless otherwise stated.

[3] CMC objects to the Court's consideration of Lambert's declaration, filed as an exhibit to her response brief in opposition of summary judgment. ECF 31-4; 35-2. CMC argues that the declaration contains several conclusory and speculative statements, that it contains several statements about which Lambert has no personal knowledge, and that it contains inadmissible hearsay. ECF 35-2. First, Lambert does not cite her declaration in her response brief, her response to CMC's statement of material facts, or her statement of material facts. ECF 31-3; 31-4; 32. Thus, the Court is not obligated to consider her statements. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). In any event, to the extent the Court has considered Lambert's declaration, this order does not rely on any statements that are speculative, outside of Lambert's personal knowledge, or inadmissible hearsay.

### 1. Lambert's Job Responsibilities

As an RN Care Manager, Lambert was responsible for "providing hospital patients with comprehensive care coordination and oversight." ECF 21-1 ¶ 5; 31-3 ¶ 5. She worked Monday through Friday from 8:00 a.m. to 4:30 p.m.[4] ECF 21-1 ¶ 27; 31-3 ¶ 27. Each morning at 9:00 a.m., Lambert attended "Multidisciplinary Rounds," which typically lasted two and a half hours. ECF 21-1 ¶ 30; 31-3 ¶ 30. Following rounds, Lambert attended a required daily "huddle" meeting lasting "from 30 minutes to an hour." ECF 21-1 ¶ 31; 26 at 42:18; 31-3 ¶ 30. Lambert spent the afternoons meeting with patients and their families, working with vendors to arrange for medical equipment deliveries, and creating discharge plans for patients. ECF 21-1 ¶ 32; 26 at 42:21-43:24; 31-3 ¶ 35. Lambert testified that she spent 60-70 percent of her time interacting with patients and their families. ECF 26 at 44:12-16. Although she testified that many of her meetings were conducted over the phone, she also testified that her face-to-face meetings with vendors and patients were held in other areas of the hospital away from her office. *Id.* at 43:25-44:25.

### 2. Lambert's Office Arrangements

At the time of Lambert's employment, the main office area for Care Managers ("CM") was located on the fifth floor of the CMC main building. ECF 21-1 ¶ 15; 31-3 ¶ 15. However, the CM department also had remote office spaces—the CM first-floor office suite and the CM second-floor office suite. ECF 21-1 ¶ 16; 68, 31-3 ¶ 16, 68. While the CM department's office space was limited during Lambert's employment, the CM department was attempting to create a new office space where each CM would

---

[4] Lambert also testified that she worked one Saturday a month. ECF 26 at 39:7-9.

have his or her own cubicle. ECF 21-1 ¶¶ 140-41; 31-3 ¶¶ 140-41. Lambert knew about this plan, but there was no concrete timeline for when the new offices would be available. ECF 26-18; 26-44.

During most of September 2023,[5] Lambert's desk was in the CM first-floor office suite. ECF 21-1 ¶¶ 20-21; 31-3 ¶¶ 20-21. The first-floor office suite had two offices, a "front office" and a "back office." ECF 21-1 ¶ 17; 31-3 ¶ 17. Lambert's desk was in the back office, which was separated from the main building's first-floor hallway by four doors and three office spaces.[6] ECF 21-1 ¶¶ 20-21, 106; 31-3 ¶¶ 20-21, 106. Then, in late September 2023, Lambert encountered a cockroach. ECF 21-1 ¶¶ 22, 23; 31-3 ¶¶ 22, 23. According to Lambert, "while she was working at her desk … a cockroach … fell from a vent, and 'then fell and crawled under [her] feet.'" ECF 21-1 ¶ 22; 26 at 103:20-104:12; 31-3 ¶ 22. That experience led Lambert to request relocation, and Lambert moved to the CM main office on the fifth floor. ECF 21-1 ¶ 25; 31-3 ¶ 25.

When Lambert relocated to the fifth floor in October 2023, only two other CMs worked there. ECF 21-1 ¶ 36; 31-3 ¶ 36. However, other employees began to move into the main office, and by early 2024, Lambert found the office "packed." ECF 21-1 ¶¶ 37-38; 31-3 ¶¶ 37-38. She testified that she worked in the main office with five to seven other employees, and that there were "constant phone calls being made." ECF 21-1 ¶ 40(g); 26 at 68:17-20; 31-3 ¶ 40(g). Additionally, the main office served as a frequent

---

[5] During the first four weeks of her employment, Lambert participated in an orientation program. ECF 21-1 ¶ 10; 31-3 ¶ 10. Lambert was under a probationary period for the first 90 days of her employment, which she successfully completed in early December 2023. ECF 21-1 ¶¶ 12-13; 31-3 ¶¶ 12-13.

[6] An "initial office space" and an "inner office area" separated the CM first-floor office suite from the main hallway. ECF 21-1 ¶¶ 95-96; 31-3 ¶¶ 95-96. Thus, one had to go through three doors to enter the CM first-floor office suite. ECF 21-1 ¶ 98; 31-3 ¶ 98. The back office was accessible only through a fourth door. ECF 21-1 ¶ 106; 31-3 ¶ 106.

venue for "lunch and learn" meetings with catered lunches. ECF 21-1 ¶ 40(g), (o); 26 at 67:7-11, 70:16-19, 71:7-23; 31-3 ¶ 40(g), (o). The main office was also adjacent to the Dialysis Department, and Lambert said she could hear noises from the dialysis machines. ECF 21-1 ¶ 40(h), (i); 26 at 69:17-25; 31-3 ¶ 40(h), (i).

By late December 2023, Lambert was "unsatisfied with the work environment" in the main office. ECF 21-1 ¶ 40; 31-5 ¶ 137; 31-3 ¶ 40. She testified that working in the main office was "becoming more difficult," to the point that it "felt like it was enclosing in around [her]." ECF 21-1 ¶ 40(f); 26 at 54:15-17, 70:11-15; 31-3 ¶ 40(f). Lambert, thus, wanted to move offices as an accommodation for her ADHD and PTSD.

### 2. Lambert's Accommodation Requests

On January 5, 2024, Lambert sent a message to her manager, Nikia Davis; her second-level supervisor, Nora Gibson; and CMC's Senior Human Resources ("HR") Generalist, Tracie Campbell-Kendrick. ECF 21-1 ¶ 43; 31-3 ¶ 43. Lambert's message stated:

> I was wondering if it is still going to be some time before we are given our office space – is there somewhere possibly I could be placed that is a much more quiet less stimulating environment?

> This is a very busy office, loud, next to elevator and HD office and very overstimulating. I feel I would best be able to take time to adequately prepare my thoughts in communication and organize tasks better without so much external stimulation.

ECF 21-1 ¶ 43; 26-18; 31-3 ¶ 43. Davis responded:

> At this time we do not have a completion date for the new office. All of our satellite CM offices are currently occupied. There currently isn't an office space available for CM use that meets the above criteria. I will speak with other leaders, and keep an eye out though.[7]

---

[7] Lambert disputes the truth of Davis' statement, but she does not dispute that Davis sent her the above message. ECF 31-3 ¶ 44.

ECF 21-1 ¶ 44; 26-18; 31-3 ¶ 44.

On January 10, 2024, Lambert visited HR Generalist Campbell-Kendrick to inquire about submitting a request for a disability accommodation. ECF 21-1 ¶ 45; 31-3 ¶ 45. Campbell-Kendrick instructed Lambert on CMC's disability accommodation process. ECF 21-1 ¶ 47; 31-3 ¶ 47. On January 10, Lambert emailed Gibson, Davis, and Campbell-Kendrick to notify them that she planned to formally request an accommodation. ECF 26-21 at 2. She wrote that her request would "be solely for workspace/office with less traffic, and/or next to machines/elevators, etc." *Id.* That day, Davis responded that "the only space reserved for case management that is further away from the floors" was the CM first-floor office suite's back office, where Lambert began her orientation. ECF 26-21. Davis told Lambert that she could move to that office. *Id.* at 2. In response, Lambert wrote that she planned to file a formal request for an ADA accommodation. *Id.* at 1.

On January 12, 2024, Lambert filed that formal ADA accommodation request with Sakinah Robinson, a leave and accommodation specialist. ECF 21-1 ¶ 48; 26 at 55:24-57:15; 26-20; 31-3 ¶ 48. In her request, Lambert stated that she had two disabilities: "[a]dult attention deficit hyperactive disorder" and "[p]ost-traumatic [s]tress [d]isorder." ECF 21-1 ¶ 50; 26-20 at 1; 31-3 ¶ 50. She requested an accommodation that would allow her to "work[] in a non-central desk/work area or have [the] ability to close a door[] to complete work requiring focus and attention to details." 21-1 ¶ 51; 26-20 at 1; 31-3 ¶ 51. Lambert's doctor confirmed her diagnosis and reiterated that she needed a "[q]uiet work environment free from distractions—preferably with a door to reduce distractions." ECF 21-1 ¶ 60; 26-22; 31-3 ¶ 60. Thus, Robinson began

processing Lambert's accommodation request. ECF 26-19 at 6. Robinson testified that she partnered with Davis throughout the accommodation process. ECF 24 at 24:10-25:22 (Explaining that she "advised the department, and the department [made] the final decision.").

Early in the accommodation process, Lambert "made it clear that she wanted to move to an office space on the Second Floor of the CMC Main Building." ECF 32 at 9; *see* ECF 26 at 80:18-20. Lambert suggested two rooms she believed would be suitable for her accommodation—the second-floor supply room and the second-floor utility room.[8] ECF 26 at 80:6-88:6.

However, Davis testified that she and Robinson determined that neither of those rooms were suitable for an accommodation.[9] ECF 21-3 ¶¶ 6-17. According to Davis, the supply room was "used as a storage room for the entire CM Department" as well as a "break area for [CM] employees." ECF 21-3 ¶ 13. The utility room was unsuitable because it was used as storage for Davis as she transitioned into a new office, and because it housed a filing cabinet with confidential and sensitive files.[10] ECF 21-3 ¶ 7. Davis stated that the cabinet had to be stored in the utility room because it "was the only

---

[8] It's unclear when Lambert first suggested the second-floor office spaces as an accommodation.

[9] Lambert claims that the second-floor office spaces could have been made suitable for her use. *E.g.*, ECF 31-3 ¶¶ 89-91.

[10] In January 2024, Davis was promoted to CM Director, a role formerly held by Nora Gibson. ECF 21-3 ¶ 6. Davis moved from Piedmont Macon North Hospital to CMC. *Id.* During that transition, Davis stated that she and Gibson used the utility room as "transitional storage of various equipment, files, and other items." *Id.*

secured location within the control of the CM Department that was available to [her]."[11] ECF 21-3 ¶ 9.

Davis suggested that Lambert move to the back office of the first-floor suite. ECF 21-1 ¶ 114; 21-3 ¶ 36; 31-3 ¶ 114. In a February 1, 2024, email, Robinson formally offered Lambert the back office in the first-floor office suite as an accommodation.[12] ECF 21-1 ¶ 118; 26-45; 31-3 ¶ 118. According to Robinson's notes, she told Lambert that the office "would only have one other person and may be a significant reduction in noise and distractions." ECF 26-45.

Lambert declined Robinson's accommodation offer on February 16, 2024. ECF 21-1 ¶ 119; 26 at 124:3-17; 26-46; 31-3 ¶ 119. Robinson memorialized Lambert's rejection in a letter emailed to Lambert on February 21, 2024, which read:

> As of 2/16/24, you have declined the reasonable accommodation offered to you. During the interactive process, we also discussed the option of noise canceling headphones, for which you advised you are currently using. You have agreed to remain in your current work environment and will continue the use of your noise cancelling headphones. We are aware of the upcoming changes occurring to [the] landscape of your department's office space that will change the parameters of your work environment and will be in compliance with the accommodation requested.[13]

---

[11] In her response to CMC's statement of facts, Lambert disputes whether the files needed to be stored in the utility room because that room was sometimes left unlocked. ECF 31-3 ¶ 82. Lambert claims, without citations to the record, that "[a]ll case managers had keys to enter the second floor office." *Id.* ¶ 75. However, Davis stated in her declaration that only the outgoing CM Director, Gibson, had keys to the utility room. ECF 21-3 ¶ 8. As Davis transitioned into her role as CM Director, she stated that Gibson would leave the door unlocked so that Davis could access the utility room, but that the second-floor office suite always remained locked. *Id.* ¶¶ 8, 10.

[12] Lambert claims she was offered a desk in the front office of the CM first-floor office suite, not the back office. ECF 31-3 ¶ 116. However, Lambert does not dispute that Davis offered her the back office in her February 1, 2024 email. ECF 26-21 at 2; 31-3 ¶ 118. Moreover, Davis stated in her declaration that she and Robinson concluded that the *back* office would be a suitable accommodation. ECF 21-3 ¶ 36.

[13] The "changes" referred to by Robinson were the CM department's new office space that would provide each CM with a cubicle. During the accommodation process, Robinson inquired as to the timeline of the new office space. Davis responded that "[t]here is no time frame" but that she would let Robinson know when she had more information. ECF 26-44.

ECF 26-46.

Lambert testified that she never tried to use the first-floor office suite's back office after she rejected Robinson's accommodation offer.[14] ECF 26 at 149:22-150:1. According to Lambert, she was not willing to try the office because "it didn't meet the [accommodation] requirements." ECF 26 at 150:2-5. Rather than moving to the first-floor office suite, Lambert "agreed to remain in [her] current work environment" while continuing the use of noise-cancelling headphones. ECF 26-46 at 1. Thus, Lambert's accommodation case was closed by Robinson on February 21, 2024 pending the availability of the new offices after the CM department's planned move was complete. *Id.* Robinson instructed Lambert to inform her if she "need[ed] to reevaluate [her] accommodation" after the changes to the department's office spaces had been completed. *Id.*

Lambert testified that an accommodation in the first-floor office suite did not meet her requirements for four reasons. First, during her September 2023 orientation, that cockroach fell from the ceiling. ECF 26 at 124:24-25. Second, she believed that the office would be loud because it was used for training. *Id.* at 124:22-25. Third, Lambert was concerned that she would not be able to "control the quiet and distractions." ECF 21-1 ¶ 120(c); 126:9-10, 139:4; 26 at 4-12; 31-3 ¶ 120(c). Finally, Lambert believed that

---

[14] Lambert claims she had previously been assigned to that area and "was fully aware of the high traffic in that office, [and] that poorly placed desk up against the window [in] the break area and next to the entrance door and copier/printer/fax." ECF 31-33 ¶ 134. She does not dispute, however, that she never tried to use the first-floor back office after it was offered as an accommodation in 2024.

the other employee who worked in the back office "would require the door to be open." ECF 21-1 ¶ 120(d); 31-3 ¶ 120(d).[15]

### 3. Lambert's Disciplinary History

In the midst of the accommodation process, Lambert received, on January 22, 2024, a disciplinary "First Written Warning." ECF 21-1 ¶ 63. The warning was based on four incidents regarding attendance and timeliness. ECF 26-29 at 1-2. Specifically, Lambert was absent on October 24, 2023; she left early on November 6, 2023; and she was late for two consecutive days on January 18 and 19, 2024. *Id.* at 1. Lambert signed a corrective action form, acknowledging that she received a copy of the written warning, and that the warning was discussed with her. *Id.* at 2. The corrective action form explained that "[c]ontinued attendance, performance, and/or conduct violations may result in immediate dismissal from Piedmont Healthcare without issuance of another warning." *Id.* at 2.

Lambert's next infraction occurred on March 6, 2024. A few minutes after Lambert's normal 8:00 a.m. start time, Senior HR Generalist Maegon Davis saw Lambert leave through the main entrance of building B, get into her vehicle, and drive away. ECF 21-1 ¶ 148; 31-3 ¶ 148. Suspecting that Lambert was attempting to avoid being caught arriving late to work, Senior HR Generalist Davis reported her observations to Campbell-Kendrick, Davis's supervisor. ECF 21-1 ¶¶ 149, 154; 31-1 ¶¶ 149, 154.

---

[15] In response to CMC's statement of material facts, Lambert says there were other reasons why her accommodation requirements were not met, but she does not specify what the other reasons were. ECF 31-3 ¶ 120.

Lambert admits that although her desk was in a different area, she clocked in on the first floor of building B at 8:01 a.m. that day. ECF 21-1 ¶ 153; 31-3 ¶ 153. Lambert then "exited building B, drove to the employee parking lot, took the employee shuttle bus back to CMC, entered the building, walked to the cafeteria, walked out with a Styrofoam box, and eventually made her way down the hall toward the main elevators." ECF 21-1 ¶ 157; 31-3 ¶ 157. Lambert left the cafeteria at approximately 8:14 a.m. ECF 21-1 ¶ 156; 31-3 ¶ 156.

After investigating the incident, Campbell-Kendrick determined that when Lambert clocked in and then left to park her car and then went to the cafeteria, she had engaged in a "deliberate act of dishonesty" and "theft of time," which are "'Level 3 Violations' of CMC's 'Corrective Discipline Policy.'" ECF 21-1 ¶ 161; 25 at 25:19-31:9; 31-3 ¶ 161. CMC's corrective discipline policy provides that a level 3 violation "may result in more severe levels of corrective action, up to and including termination." ECF 26-9 at 5. While time theft is not specifically listed as a level 3 violation, it is a level 3 violation to engage in "[a]cts of dishonesty, deliberate or negligent omissions or falsification of documentation." *Id.* at 5. Campbell-Kendrick ultimately decided that Lambert's conduct warranted termination. ECF 21-1 ¶ 164; 25 at 25:19-26:6; 31-3 ¶ 164. According to Campbell-Kendrick, after she determined termination was appropriate, she drafted talking points and contacted Davis to inform her of Lambert's termination. ECF 21-4 ¶ 16; 25 at 29:12-30:2. Campbell-Kendrick and Davis met with Lambert at around 10:00 a.m. on March 6, 2024, and terminated Lambert's employment. ECF 21-1 ¶ 169; 31-3 ¶ 169. Campbell-Kendrick testified that she alone

made the decision to terminate Lambert and that Davis' only involvement in Lambert's termination was Davis' presence at the meeting. ECF 21-4 ¶ 17; 25 at 26:4-6.

## B. Procedural History

Lambert brought this action on June 5, 2024. ECF 1. In her second amended complaint, Lambert asserts two claims: (1) ADA Discrimination, and (2) ADA Retaliation. ECF 11 at ¶¶ 47-62. CMC has moved for summary judgment on both claims.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Info. Sys. & Networks Corp.*, 281 F.3d at 1224. The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing

*Four Parcels of Real Prop.*, 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id*.

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Thus, the Court "can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show ... that there is an absence of evidence to support the nonmoving party's case." *Id.*

at 1438 (cleaned up). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Cartrett.*, 477 U.S. at 324).

### III. DISCUSSION

CMC argues that it is entitled to summary judgment because there is no genuine issue of material fact and because a reasonable jury could not find that CMC discriminated against Lambert because of her disability or that it retaliated against her under the ADA. ECF 21-2 at 5-20. The Court agrees.

**A. ADA Discrimination**

Title I of the ADA makes it unlawful for employers to discriminate against an otherwise qualified individual based on her disability. 42 U.S.C. § 12112(a). Discrimination under the ADA includes an employer's failure to provide a reasonable accommodation and an adverse employment action against an employee because of her disability. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). Lambert's complaint asserts that CMC did both. ECF 11 ¶¶ 50-52.

*1. Failure to Accommodate*

Lambert first asserts that CMC violated the ADA by failing to provide her a reasonable accommodation. ECF 11 ¶ 52. CMC argues that it is entitled to summary judgment on Lambert's failure to accommodate claim because it offered her a reasonable accommodation and because Lambert's outright rejection of its accommodation offer caused a breakdown in the interactive accommodation process. ECF 21-2 at 7.

To prevail on an ADA failure to accommodate claim, a plaintiff must show that (1) she is disabled, (2) she is qualified, (3) her employer failed to provide her with a reasonable accommodation, and (4) "that failure negatively impact[ed] [her] hiring, advancement, discharge, compensation, training, [or] other terms, conditions, and privileges of [her] employment." *Holly*, 492 F.3d at 1255-56, 1263 n.17; *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023).

The employee, at the summary judgment stage, bears the burden of producing evidence that a reasonable accommodation was available. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001). "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job."[16] *Lucas*, 257 F.3d at 1255. "'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); 29 C.F.R. § 1630.2(n)(1). Where an employee cannot identify a reasonable accommodation, "the employer has no affirmative duty to show undue hardship." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). Finally, because "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination," the "*McDonnell Douglas* burden-shifting [framework] is not applicable to reasonable accommodation cases." *Holly*, 492 F.3d at 1262; *Nadler v. Harvey*, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007). CMC does not dispute that Lambert was

---

[16] The Eleventh Circuit questioned this definition in *Beasley*. 69 F.4th at 756-58. However, the concurrence in *Beasley* argued that the definition as stated in *Lucas* was not dicta and is a governing rule. *Id*. at 761-62 (Luck, J. concurring). In any event, Lambert does not argue that CMC's obligation to reasonably accommodate her stretched beyond the essential functions of her position. *See Beasley*, 69 F.4th at 758-60 (declining to adopt a new reasonable accommodation definition because the "requested accommodations … involve[d] essential functions").

disabled or that she was a qualified individual. ECF 21-2 at 7. Thus, the only issue is whether Lambert has presented evidence that CMC failed to provide her with a reasonable accommodation. She has not.

CMC offered to accommodate Lambert by moving her to a desk in the first-floor office suite's back office. ECF 21-1 ¶ 92; 21-3 ¶¶ 36-38; 26-21 at 2; 31-3 ¶ 92. Lambert admits that only one other employee worked in the back office; that the CM first-floor office suite did not contain a break area; that the back office was fully furnished; that the back office was not a venue for vendors to host lunches; and that the back office was not near the main hallways and elevators. ECF 21-1 ¶¶ 94, 96, 98, 99, 106, 109, 112, 113, 117(e), (k); 31-3 ¶¶ 94, 96, 98 ,99 106, 109, 112, 113, 117(e), (k). Nonetheless, Lambert testified that the first-floor office suite would have been unsuitable for her accommodation needs. ECF 26 at 137:13-142:9. First, she testified that the back office would be loud because it was used as a "training area" for new hires. ECF 26 at 124:24-25; 137:18-22. However, there is no evidence that the back office would be used for training during the relevant time period. While Lambert and others had trained in the office previously, Davis stated in her declaration, "there was no intent to use the First Floor CM Office Suite for new CM training if Plaintiff was to be placed there on a permanent basis." ECF 21-3 ¶ 50. According to Davis, "training sessions had ended by the third week of January 2024, and no further training was required at this point or in the near future." *Id.* ¶ 52.

Lambert also testified that the back office was not suitable because "there [were] roaches that [fell] from the ceiling." ECF 26 at 124:22-25. But there is only evidence of one falling cockroach. ECF 26 at 103:21-104:25. Lambert has not provided any

evidence that there was a pervasive pest issue in the back office. Moreover, Davis stated in her declaration that the entire office suite was fumigated following Lambert's cockroach encounter and that neither of the employees in the first-floor office suite "ever reported a cockroach sighting in that space." ECF 21-3 ¶ 56-57.

Finally, Lambert stated that she believed the first-floor office suite was also a loud environment and that the other employee in the back office would not allow the door to be closed. ECF 26 at 139:2-8. But, again, there is no evidence in the record that Lambert actually asked if she would be able to close the door, and she admits that she refused to try out the first-floor office suite to determine whether it would work. ECF 21-1 ¶ 134; 26 at 149:22-150:13; 31-3 ¶ 134. Further, Davis stated that if asked, she would have assured Lambert that "whenever she worked in that office, she would be permitted to keep the door shut." ECF 21-3 ¶ 54. Thus, despite Lambert's speculation about the suitability of the back office, there is no evidence in the record that the back office was not a reasonable accommodation.

Lambert further contends that CMC is not entitled to summary judgment because "a jury could decide that the facts do not support that [CMC] acted at all in good faith" during the interactive process. ECF 32 at 15. Specifically, she argues that she "identified two rooms that she could occupy to satisfy her request for a reasonable accommodation," and that CMC's failure to offer her one of those rooms constituted a refusal to engage in the interactive process. *Id.* at 11.

When an employee requests an accommodation, the ADA regulations contemplate that "it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability." 29 C.F.R. § 1630.2(o)(3). The

regulations state that the interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* However, the interactive process is a mutual obligation, and an employee cannot recover if her "actions cause a breakdown in the interactive process." *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997).

Here, Lambert attributes the flawed interactive process to the fact that Davis, with whom Lambert contends she had a "toxic" relationship, was the "sole decision maker" regarding her accommodation. ECF 32 at 15. However, even construed in the light most favorable to Lambert, she has not provided evidence that Davis' alleged negative feelings toward Lambert impacted the interactive process.[17] In response to Lambert's January 10, 2024 email, Davis offered Lambert the option to immediately move to the back office. ECF 26-21 at 1-2. After Lambert filed her formal accommodation request, Robinson communicated with Lambert, Davis, and other CM department leaders to determine what office spaces were available. *E.g.*, 26-44; 26-45. And while Davis made the ultimate decision regarding which offices were available, Robinson asked Davis follow-up questions to ensure that Lambert's preferred office spaces were not available. ECF 26-44. Thus, even if Davis made the ultimate decision, there is uncontroverted evidence that Robinson engaged with Lambert and Davis to evaluate Lambert's accommodation needs.

---

[17] Lambert's declaration details many interactions that suggest a negative relationship with Davis. ECF 31-5. However, as stated, there is no evidence that those interactions tainted the accommodations process.

Moreover, Davis provided specific reasons why Lambert's preferred offices were not available. ECF 26-44; 26-45. Davis stated that the second-floor utility room was unavailable because it was used "to store confidential records of patients and employees and other sensitive items." ECF 21-3 ¶ 7; s*ee* ECF 24 at 17:21-18:7. And according to Davis, the second-floor supply room was not suitable because it was "used as a storage room for the entire CM Department" and as a "break area for [CM] employees." ECF 21-3 ¶ 13.

While Lambert disagrees, she offers only speculative assertions to support her contention that the second-floor offices could be made available. For instance, in her response brief, Lambert states it is "[i]mpossible to believe that [the filing] cabinet could not be moved elsewhere or made lockable." ECF 32 at 11. In her response to CMC's statement of material facts, Lambert speculates that Davis moved equipment into the second-floor supply room intentionally to prevent her from making that room her office. ECF 31-3 ¶ 74; 32 at 14. The Court cannot consider Lambert's unsworn and speculative statements. *See Corwin v. Walt Disney World Co.,* 475 F.3d 1239, 1549 (11th Cir. 2007) ("Even on summary judgment, a court is not obligated to take as true testimony that is not based on personal knowledge." (quoting *Citizens Concerned About Our Children v. School Bd. of Broward Cnty., Fla.*, 193 F.3d 1285, 1295 n.11 (11th Cir. 1999))); *First-Citizens Bank & Trust Co. v. Brannon*, 722 F. App'x. 902, 905 (11th Cir. 2018) ("As a general rule, district courts may not consider unsworn statements when 'determining the propriety of summary judgment.'" (quoting *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980))). But even if Lambert's speculations were probative, they do not create a genuine issue of material facts. At most, Lambert has provided evidence

that CMC failed to offer her the office space she preferred. However, evidence that CMC failed to offer Lambert her preferred accommodation is not evidence that CMC failed to engage in the interactive process or that it failed to offer her a reasonable accommodation. *See Stewart,* 117 F.3d at 1286 ("[U]nder the ADA, a qualified individual with a disability is 'not entitled to the accommodation of her choice, but only to a reasonable accommodation.'" (*quoting Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995))); *Adamson v. City of Birmingham*, 2024 WL 5088414 at *2 (11th Cir. 2024) ("[T]he City was required to provide a reasonable accommodation, which it did, and was not required to provide [its employee's] specific preferred accommodation"). Lambert's evidence that she and Davis had a "toxic" relationship, without evidence that Davis' feelings toward Lambert affected the interactive process, does not create a genuine issue of material fact.

Moreover, it was Lambert, not CMC, who ended the interactive accommodation process. On February 16, 2024, Lambert rejected CMC's proposed accommodation, electing to remain in the main office and to continue using noise-cancelling headphones. ECF 21-1 ¶ 135; 26-46 at 1. There is no evidence that Lambert asked further questions, attempted working in the first-floor office suite to test the environment, or requested further collaboration to find a suitable alternative accommodation. In short, CMC has offered uncontroverted evidence that when Lambert was denied her preferred accommodation, she refused to consider the alternative offered by CMC and ended the accommodation process. As the Eleventh Circuit has stated, "[l]iability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide

accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process." *Stewart*, 117 F.3d at 1287.

Here, no reasonable jury could find that CMC discriminated against Lambert by failing to offer her a reasonable accommodation.[18] Accordingly, CMC is entitled to summary judgment as to Lambert's failure to accommodate claim.

### 2. Disability Discrimination – Termination

In her second amended complaint, Lambert also asserts that CMC discriminated against her by terminating her because of her disability. ECF 11 ¶¶ 50, 51. CMC argues that Lambert has abandoned this claim, and, even if she has not, she provided no evidence of a comparator or discriminatory intent. ECF 21-2 at 20-22; 35 at 9.

Courts evaluating ADA disability discrimination claims based on circumstantial evidence[19] use the *McDonnell Douglas* burden-shifting framework. *See Akridge v. Alfa Ins. Co.*, 93 F.4th 1181, 1191 (11th Cir. 2024) (citing *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021). Alternatively, ADA disability discrimination plaintiffs may proceed under the convincing mosaic approach. *Id.* at 1197; *Smith v.*

---

[18] Lambert also argues that "undue hardship was never proven." ECF 32 at 15. CMC has no burden to provide evidence of undue hardship unless Lambert first establishes that CMC failed to offer her a reasonable accommodation. *Beasley*, 69 F.4th at 754 ("The first element—discrimination—occurs 'when the employer fails to provide "reasonable accommodations" for the disability—*unless doing so would impose an undue hardship on the employer.*'" (emphasis added) (quoting *Lucas*, 257 F.3d at 1255 (2001))).

[19] Lambert states that "[i]n the instant case the evidence is asserted to be direct but is at least circumstantial." ECF 32 at 2. "Direct evidence is 'evidence, which if believed, proves existence of fact without inference or presumption." *Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017). Lambert presents no such evidence. *See Wilson v. B/E Aero, Inc.*, 376 F.3d 1079 (11th Cir. 2004) ("As our precedent illustrates, 'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination.'" (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir 2002))), *abrogated on other grounds by Lewis, v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019).

*Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 ("A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011))). Regardless of the specific framework, the question ultimately is "whether the evidence permits a reasonable factfinder to find that the employer [discriminated] against the employee." *Berry v. Crestwood Healthcare LP.*, 84 F.4th 1300, 1311 (11th Cir. 2023).

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). This burden of production means the employer "need not persuade the court that it was actually motivated by the proffered reasons," but must produce evidence sufficient to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

A plaintiff must then show that the employer's stated reason is in fact pretext for discrimination. *Id.* at 1308. This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 1308 (emphasis added) (quoting *Burdine*, 450 U.S. at 256). Ultimately, the burden of

persuasion rests with the plaintiff who must show that the proffered reasons for the employment action were pretextual—thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of impermissible discrimination.

To establish a prima facie case of disability discrimination, the plaintiff must provide evidence that (1) she has a disability; (2) she is a qualified individual under the ADA; and (3) the employer discriminated against her "on the basis of disability." *See Beasley,* 69 F.4th at 754 (11th Cir. 2023); 42 U.S.C. § 12112(a); *see also Akridge*, 93 F.4th at 1192 (holding that § 12112(a) still imposes a "but-for" causation standard after the 2008 amendment to the ADA). Again, CMC does not dispute that Lambert was disabled and was a qualified individual or that her termination was an adverse employment action. ECF 21-2 at 15.

First, the Court agrees that Lambert has abandoned her termination claim. Lambert's discussion of her termination claim is terse and conclusory. Lambert's only reference to her termination claim is her statement, "CMC is not entitled to summary judgment … because Plaintiff does show … that she was terminated because of her disability." ECF 32 at 1-2. Lambert makes no effort to respond to CMC's arguments in support of summary judgment on this claim. *Id.* at 1. Lambert has, thus, abandoned her disability discrimination claim. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atl.*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Sapuppo v. Allstate Floridian Ins. Co.,* 739 F.3d 678, 681 (11th Cir. 2014) (collecting cases) ("We have long held that an appellant abandons a

claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

Second, because Lambert has not responded in any meaningful way to CMC's motion for summary judgment on her termination claim, it necessarily follows that she has not established a prima facie case. Specifically, Lambert makes no attempt to provide evidence that she was treated less favorably than a similarly situated, non-disabled person. *Akridge*, 93 F.4th at 1194 ("The ADA's text 'require[s] a plaintiff alleging disparate treatment to prove that [s]he was treated less favorably than a similarly situated, non-disabled person.'" (quoting *Lewis,* 918 F.3d at 1223)). Without such evidence, Lambert fails to establish a prima facie case of disability discrimination under the *McDonnell Douglas* framework.

Nor has Lambert built a convincing mosaic of circumstantial evidence that CMC terminated her with discriminatory intent. "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale,* 46 F.4th 1268, 1275-78 (11th Cir. 2022))). Again, apart from a passing reference to her disparate treatment claim, Lambert does not make specific arguments or point to specific evidence that supports a reasonable inference that CMC acted with discriminatory intent. At most, her brief could be construed to contend that Campbell-Kendrick's monitoring of her accommodation process supports her claim that she was terminated out of discriminatory intent. ECF 32

at 15. But Campbell-Kendrick's knowledge that Lambert requested an accommodation is not "circumstantial evidence that creates a triable issue concerning [CMC's] discriminatory intent." *Jenkins*, 26 F.4th at 1250 (quoting *Lockheed-Martin Corp.*, 644 at 1328).

Accordingly, CMC is entitled to summary judgment on Lambert's ADA discrimination claim.

## B. Retaliation

Finally, Lambert asserts a claim for retaliation under the ADA. ECF 11 at 54-62. CMC argues that Lambert's claim fails because she has not provided evidence to establish a prima facie case of retaliation, and even if she had, she has not provided evidence of pretext. ECF 21-2 at 15-19.

Like disability discrimination claims, ADA retaliation claims based on circumstantial evidence can be evaluated using the *McDonnell Douglas* burden-shifting framework. *Batson v. Salvation Army*, 897 F.3d 1320, 1328-29 (11th Cir. 2018). As the law currently stands in the Eleventh Circuit, plaintiffs can also prove retaliation through the convincing mosaic approach. *See Berry*, 84 F.4th at 1310; *Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, at 1337-38 (11th Cir. 2023).

To establish a prima facie case of retaliation, "a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d

791, 798 (11th Cir. 2000).[20] "The third element requires a showing of but-for causation." *Frazier-White*, 818 F.3d at 1258.

CMC does not dispute that Lambert engaged in statutorily protected conduct or that she suffered an adverse employment action. ECF 21-2 at 15. Rather, CMC argues that Lambert's termination was not causally connected to her accommodation request, and that Lambert "cannot overcome the undisputed evidence that her termination for misconduct was wholly unrelated to her protected activity." *Id.* The Court agrees.

As an initial matter, Lambert argues that Campbell-Kendrick did not "give [plaintiff] a chance to explain the alleged criminal conduct she was terminated for" and that CMC "has produced no evidence to prove that Plaintiff had the mens rea to prove criminal intent." ECF 32 at 15. First, Lambert cites no authority, and the Court has found none, that required CMC to give Lambert the chance to explain herself, much less that an employer must prove criminal intent to discharge an at-will employee. Further, the Court's role is not to determine whether CMC's decision to terminate Lambert was proper. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("[I]t is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with discriminatory motive.").

Turning to the *McDonnell Douglas* analysis, Lambert has failed to provide evidence by which a reasonable jury could find that her accommodation request was a but-for cause of her termination. Again, Lambert argues that she should prevail because Campbell-Kendrick "kept close tabs on the progress of" her accommodation process.

---

[20] ADA retaliation claims are analyzed under the same framework used in Title VII retaliation claims. *Stewart*, 117 F.3d at 1287.

ECF 32 at 15. Specifically, Lambert argues that a jury could find that CMC retaliated against her for requesting an accommodation because Campbell-Kendrick was listed as a recipient of over twenty emails regarding Lambert's accommodation process and because Campbell-Kendrick sent two emails thanking Robinson for an update on the progress of Lambert's accommodation request. *Id.* at 16; *see, e.g.*, ECF. 31-2 at 2-8. However, as an HR Generalist, it was Campbell-Kendrick's job to provide "HR support to the Care Management Department." ECF 21-4 ¶ 4; *see* ECF 21-1 ¶ 47; 31-3 ¶ 47. Moreover, Lambert initially sought guidance from Campbell-Kendrick when she filed her accommodation request. ECF 21-1 ¶ 45; 31-3 ¶ 45. Campbell-Kendrick's mere knowledge is insufficient to demonstrate that Lambert's termination "would not have occurred in the absence" of her accommodation request. *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

But even if Lambert had met her burden to establish a prima facie case of retaliation, CMC has articulated a legitimate, nondiscriminatory reason for Lambert's termination. Lambert admits that on March 6, 2024, she clocked in, left the building, drove to the parking lot, took a bus back to the building, and stopped at the cafeteria before going to her office. ECF 21-1 ¶¶ 148, 156; 31-3 ¶¶ 148, 156. She admits that she did not arrive at her desk until after 8:15 that day. ECF 21-1 ¶ 156; 31-3 ¶ 156. And she admits that the corrective action form she signed in January warned her that "[c]ontinued attendance, performance, and/or conduct violations may result in immediate dismissal from Piedmont Healthcare without issuance of another warning." ECF 21-1 ¶¶ 146-47; 26-29 at 2; 31-3 ¶¶ 146-47. According to CMC's corrective discipline policy, "[a]cts of dishonesty, [and] deliberate or negligent omissions or

falsification of documentation" is a "Level 3" violation. ECF 26-9 at 5. Level 3 violations "are generally more severe departures from … accepted policies and behaviors" and, thus, "may result in more severe levels of corrective action, up to and including termination." *Id.* Thus, CMC has offered evidence that it terminated her for a violation of CMC's policies, not because of her disability accommodation request.

Moreover, Lambert has not provided evidence that CMC's stated reason for Lambert's termination was a pretext for discrimination. Again, evidence that Campbell-Kendrick kept "close tabs" on the accommodation process, without more, is not enough. *See Knight v. Florida Dep't of Transp.*, 291 F. App'x 955, 960 (11th Cir. 2008) ("Although mere knowledge of protected activity by a decisionmaker can be sufficient to survive the prima facie case … knowledge alone is not necessarily sufficient once the analysis moves to the pretext stage." (internal citations omitted)).[21] Accordingly, Lambert's retaliation claim fails under the *McDonnell Douglas* framework.

Finally, Lambert has failed to create a convincing mosaic of retaliation. Lambert's evidence that Campbell-Kendrick monitored the accommodation process is, again, insufficient by itself to raise a reasonable inference of retaliatory intent under the convincing mosaic approach. *See id.*

---

[21] Lambert does not argue that the temporal proximity between her protected activity and her termination is sufficient to create a jury issue, despite pointing out that she was terminated two weeks after lodging a complaint regarding her ADA accommodations process. ECF 32 at 13. Regardless, temporal proximity does not save Lambert's claims. She violated CMC's attendance policy several times, both before and after she requested an accommodation, including on the morning she was terminated. ECF 26-29 at 1. Thus, Lambert's misconduct is sufficient to sever any temporal connection. *See Berry*, 84 F.4th at 1309 (11th Cir. 2023); *see Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520 (11th Cir. 2007) ("[C]lose temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity."); *Cisero v. ADT LLC of Del.*, 2021 WL 1712206, at *14 (N.D. Ga. 2021) ("Plaintiff cannot avoid the fact that she had documented ongoing behavior and performance issues that were present both before and after Plaintiff started complaining of discrimination.").

Accordingly, CMC is entitled to summary judgment on Lambert's ADA retaliation claim.

## IV. CONCLUSION

Lambert failed to provide evidence that CMC discriminated against her based on her disability and that CMC retaliated against her in violation of the ADA. Accordingly, CMC's motion for summary judgment (ECF 21) is **GRANTED**.

**SO ORDERED**, this 27th day of October, 2025.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT